Case number 25143 Robert Young v. Campbell County KY et al. Argument not to exceed 15 minutes per side. Mr. Michael O'Hara, you may proceed for the appellant. Good morning, your honors. Mr. Mando, with the court's permission, and may it please the court, I would like to focus my argument on the limited time we have this morning on our failure to protect claim brought under Farmer v. Brennan. These are claims brought against the county, Mr. Daly, Sgt. Michelle, and Sgt. Lohr. As you know, the district court dismissed this case on merits, finding that there was no material dispute of fact regarding the failure to protect claim, and that there was no underlying constitutional violation. The district court did this by relying primarily on very isolated snippets of testimony from James Daly, the jailer, at his deposition. Specifically, the court relied on Daly's testimony that the sheer volume of the incident reports prevented him from reading all incident reports in any kind of depth. And the second thing that the district court mentioned was that Daly relied on his supervisors to bring significant issues to his attention. The trial court then, we think incorrectly, said that we had nothing more than a vicarious liability, and as we all agree, vicarious liability is insufficient in a 1983 claim. If I could ask a preliminary question, was your client a pretrial detainee? I believe he was a pretrial detainee being held on specific charges. So should we not be applying the Kingsley test as opposed to the Farmer test? I think, Your Honor, that ultimately the burden is going to be the same on us. We have to show a subjective awareness of a risk posed. But under Kingsley, it's an objective standard. The Supreme Court decided the Kingsley case in an excessive force context, and this is obviously a failure to protect context. But the key difference is subjective versus objective. And we agree that we agree for purposes of this case that we meet both standards. And I think the record meets that. Judge Berlesman applied a subjective standard, the Farmer test, and so we feel like the record is sufficient to meet that test. Certainly, it's sufficient to meet any kind of objective test, as I'll explain here shortly. The district court's reliance on those two isolated comments of Mr. Daley during his deposition failed to include in the analysis substantial and robust body of record that we submitted in opposition to the summary judgment that would meet either Kingsley or Farmer. For example, the judge glossed over, didn't really discuss classification policy, and by extension, a reclassification that is most important in this case. He agreed that that is a responsibility of the jailer. He assumed that responsibility, and he agreed that violation of that policy could result in harm to inmates. And thus, in fact, he himself said, he's a lawyer, and so he didn't make classification systems, as the defendants point out in the brief. He didn't make classification decisions himself. He did say that ultimately, he had responsibility for that, and if he chose to, he could get involved directly in classification decisions. I'm struggling to understand why your arguments are different. Yes, Judge Moore, because what we're arguing is that these three individuals, and right now I'm focusing on Daley, were specifically aware of the risk posed by, and that in this case, Daley himself being the highest county liability for his knowledge and his failure to act to protect inmates. But what specifically did Daley know about Kha? Okay, so the important thing is that Daley, even as Judge Berzman indicated, Daley was, characterizes significant incidents. So can a jury fairly conclude from the record that we submitted regarding Kha himself, whether those constituted significant incidents that would be brought to his attention, remembrance of the jail by an inmate, that that would be brought to his attention. So what Daley would have reviewed, if we hold him to his word, would have included nine separate incident reports that were lost 43 days of his stay there, basically within a month and a half. He would have noticed, for example, that within a week of Kha's incarceration, there were two violations within the first week, 14, and that the second one prompted Sergeant Michelle, defendant in our failure to protect claim, to state that the jail had constant issues with him. That obviously, if she's on issues, many of those issues apparently aren't reflected in the incident reports, but the ones that are, are serious. On May 13, Daley, if he looked at significant incident reports, was charged with, or complained, Kha, two inmates actually complained about Kha in a cell that they shared with him and multiple other inmates, that he was threatening and extorting. The extortion issue carries over to the Young beating, as we'll explain later. The second inmate who complained directly to Sergeant Lohr about the extortion and threats, came up to him and said, I know no one else in the cell works to this effect. I know no one else in the cell will tell you this, but Kha is threatening and extorting commissary items from virtually all inmates in this cell. So my recollection, and correct me if I'm wrong, is that Michelle did recommend reclassification. She did ultimately in her May 20 incident report. And did she do anything more other than recommend reclassification? So in her May 20 incident report, your honor, she states that, and that was the incident where Kha had to be forcibly removed, cuffed, and OC spray was applied to separate him from another inmate he was fighting with. And she said at the conclusion of her report that she recommended reclassification, due to multiple incidents with jail staff and other inmates. And if we take daily at his word, and he actually reviewed each of these incident reports, he would have noticed, for example, that on four occasions, the Kha was so aggressive that he required officers to forcibly cuff him and remove him from the situation on at least four occasions. As I say, on May 20th, they required OC spray and cuffing. There were the other thing that the daily would have noticed if he actually looked at these significant reports, would have been that there were three separate occasions on May 15 alone, where two of which he required cuffing. And the third incident, he was so aggressive and physically aggressive toward guards, that Michelle required that he be put in a restraint chair. When she ordered backup and the bringing in of the restraint chair, Kha said, it's going to take 10 deputies to get me into that chair. When he was finally placed in the chair and restrained, he continued to yell at officers. And in the words of Kha, move in a physical manner, even within the restraints against the officers. This is a man who clearly is a threat, not just, he's clearly a threat to the officers themselves. But obviously, by extension, he is clearly a threat to any inmate he is sharing a cell with. Now, Judge Moore, as you point out on May 20th, Michelle recommends a reclassification that never occurred prior to the June 15 beating of Robert Young. And so he was allowed, Kha was allowed to remain in what is essentially a minimum security cell. You did not sue any of the classification deputies or the people who would have had the power to classify. Is that correct? That's correct. And it's important. And part of the reason for that, your honor, was that in our pre-suit investigation, we looked at officers who may have been directly involved with Young's care. And those are the people that we targeted as defendants in this case. And the three primary ones are Daly, Michelle, and Moore. It's important to note, and something Judge Bertelsman didn't consider, is that the classification officer you're referring to, Judge Moore, is a person by the name of Lieutenant Plummer. And she testified that there is no real reclassification system. In fact, we cited the post order that mentions classification or reclassification. And all it says is officers should be aware of potential reclassification of inmates where there's a change in behavior. There's no objective criteria in that at all. And as Plummer herself testified, it was essentially a subjective system. And she said it was pretty much in her discretion. Now, she's given no guidance for reclassification by Daly, who admitted he's responsible for that. In any event, and the bottom line is, Your Honor, as to Daly's both individual and liability as the jailer, there is no question that if he actually lived up to his word and reviewed significant reports, including ones of recurring jail violations, he would have looked at Ka's history. And he would have looked at the number of times that he had to be cuffed once he had to be placed in a restraint chair. And once OC spray had to be used to gain control of him. And would have known that this is not an inmate that should be actually sharing a cell with minimum security people like Mr. Young. And nevertheless, after this reign of incidents involving Ka, he was allowed to remain in cell 220, which most of the officers testified was essentially a minimum security cell. That was the cell that Young was left in, and the beating occurred on June 15 of 2016. That only happened because these three officers failed to take action when they knew of the risk to minimum security inmates. I see that my time is up, Your Honor, unless you have questions. Thank you. Mr. Mando. May it please the court, Mr. O'Hara, Jeff Mando on behalf of the Campbell County Defendants. I'd like to start, Judge Moore, by answering your question about Kingsley and its applicability to this particular case. First of all, Mr. Young, before the trial court and on appeal, has not advocated or argued that Kingsley applies in this context. Secondly, I'm aware that as recently as last month, in the Griffith Franklin County Detention Center case, I believe Judge Bush wrote the opinion, but I'm not 100% certain. They were given the opportunity to decide whether or not Kingsley should be applied to pretrial detainees in the context of an inmate who needs medical needs, and they declined to adopt that. They decided it on other grounds. So we don't have a precedent that says definitively that Kingsley does or does not apply here, right? Not within the Sixth Circuit, to my understanding, as of maybe late September is the last time I followed that when I read the Griffith case, Griffith versus Franklin County. Right. And so that's our position with regard to Kingsley. Well, your position is that it hasn't been decided. It has not been decided. And if this panel believes that it does apply in this particular case, the concern I have is we've not been given an opportunity to argue those points because Mr. Young never advocated that it applied. And we believe that the Farmer versus Brennan standard and deliberate indifference, both objective and subjective components still apply to this case. And I'd like to focus a little bit about what the defendants knew and when they knew it, because I think that's important for looking at the objective component of whether or not my clients, specifically Sergeant Michelle, Sergeant Lohr, and Jailer Daley knew that Mr. Young faced a substantial risk of serious harm and then disregarded that risk. If we start with Sergeant Michelle, because she had the most interaction with Mr. Young, according to the record, in terms of disciplinary incidents, what this court sees and what Judge Berlesman saw was an inmate who had cursed at jail staff, who was rude and disrespectful to courthouse staff, who was aggressive with deputies on one occasion, um, and who engaged in a, ultimately engaged in a fight with an inmate, which is what led Deputy Sergeant Michelle to make a recommendation that Mr. Kaugh be considered for reclassification. So from the standpoint of applying the standard to Sergeant Michelle, it's fairly apparent that she took action based upon what she thought was reasonable, based upon the facts with which she was confronted. With regard to Sergeant Lohr... So if we could just focus on Michelle for a minute. She did recommend reclassification, and that reclassification didn't happen. Did she have any further interaction... She did not... ...with Young? It did not happen. Judge Lohr, it did not happen before the assault on June 15th, and she, to my knowledge, she had no further interaction with Mr. Kaugh until after the assault, when it came to her attention, she conducted an investigation... Okay, so, so... ...into that incident. Was, was Kaugh in... I'm sorry, I'm forgetting this. Was Kaugh in the cell with Mr. Young? On June 15th, yes. Yeah. Not on the time, not on May 20th. Not on May 20th when the incident with the, when the fight occurred with the other inmate. Okay, but was there any evidence presented that Michelle knew that Kaugh had not been reclassified, even though she had recommended reclassification, and that Kaugh was in the cell or could reach someone like Mr. Young? My recollection is there's nothing in the record to establish that Sergeant Michelle knew, one way or the other, whether Kaugh had been classified between, reclassified as she had recommended between May 20th and June 15th. Why wouldn't she know if she's in the, in the jail where Kaugh was? Well, I, the only thing I can do is offer you speculation and, and some answers based upon what is in the record. We've got a 600-bed facility. There are, you know, in the course of a year, over 10,000 inmates going through that facility. It, it, that's the only thing I can tell you based upon what's evidence in the record. And I can just reiterate that, you know, she saw what was happening and made a recommendation. The classification officers have the obligation to not only classify inmates when they come into the facility, and there's detailed evidence in the record as to what that classification process involves when an inmate is booked in. There's also evidence in this record, Judge Berzman relied upon, and that is established that reclassification does occur. Reclassification is based upon the conduct of the inmates, the behavior of the inmates, and other factors that enter into that equation. With regard to, so Sergeant Michelle was not aware, she acted reasonably in response to what she saw. She didn't disregard it. She didn't ignore it. With regard to Jailer Daly, which seems to be the focus of Mr. Young's argument on appeal, I think that they are taking liberties with all due respect and looking at and cherry picking certain parts of his deposition testimony. Jailer Daly's testimony was that he was not aware of any incidents involving Mr. Kaw before the assault. He did testify that it is his practice to try and review incident reports, but he clearly said he doesn't review them all. He relies on his staff to bring significant issues to his attention. In this case, if this was a significant issue, he testified it wasn't brought to his attention. So he was not aware of any facts personally. Jim Daly personally was not aware of any facts that would put him on notice that Mr. Young faced a substantial risk of serious harm from Papa Kaw before that assault occurred. So there's no, what they really want to do, what Mr. Young, I think is really trying to apply here is not only a respondeat superior standard to establish liability on Mr. Daly, which the law clearly says they can't do. And I think Mr. O'Hare acknowledges, but they're applying a negligence standard. When delivered indifference is a much higher burden for them to meet. And I think Judge Bertelsman took great, went to great lengths to look at the evidence in this record to apply the correct civil rule 56 summary judgment standard and conclude that there were no genuine issues of material fact, even when these facts of euthanolight was favorable to Mr. Young, that would permit the claims against any of the Sergeant Michelle, Deputy Jailer Daly, or Sergeant Lohr to go to a jury on the failure to protect claim. And if you look closely at- Would you make the same argument if the Kingsley standard applied on this failure to protect claim? I'd make it, but I'm not sure under Kingsley, it's strictly an objective analysis. So I'd be making the same argument, but my argument in all candor would be weaker. Right, but do you think you would prevail? I always like to think I'd prevail, but, you know, until you get into looking specifically at Kingsley and strictly on an objective basis, I mean, clearly, I think it's naive to suggest that plaintiffs and pretrial DTNGs aren't better off most times with an objective standard. You know, I think it's hard, in all candor, it's a harder standard for them to meet under Farmer v. Brennan because of the subjective component. But as of the moment, as of this point in time, you know, Farmer v. Brennan and the two components, objective and subjective components are still in play. And that's what Judge Berlesman looked at when he decided this case. And I believe that's what this court should be focused on based upon the way this case is litigated and what the current state of the law is in the Sixth Circuit. With regard to Sergeant Lohr, I'd like to mention him because he's the third defendant on appeal that they're trying to say Judge Berlesman erred by granting summary judgment to Sergeant Lohr. I think the record is fairly clear that he was only aware of one specific incident involving Papa Kha where an inmate named May had threatened, had accused Kha of threatening him in a cell. Again, he also knew, in all fairness to Mr. Young, considering the facts, nobody was favorable to him. Sergeant Lohr also knew Kha was problematic. That was the best way he could describe it in his deposition testimony. But other than the specific incident involving inmate May accusing Kha of threatening him, he was not aware of any other facts which would put him on notice that Papa Kha posed a substantial risk of serious harm to Mr. Young. More importantly, there's evidence that Sergeant Lohr, when he became aware of that specific incident involving Papa Kha and the alleged threat to Mr. May, he moved, he separated inmates, he took action, he moved inmate May out of the cell that he was in, I think it was 132. So once again, he took reasonable action. And there's no evidence- That's part of the case, Mr. Mando. Your time is going and I think we have a pretty good handle. I don't want to speak for my colleagues on your arguments with respect to the issues that Mr. O'Hara has raised on this appeal. And I'd like to commend Mr. O'Hara for narrowing the focus so that we could look at that in great detail. But candidly, I thought the most difficult part of the case for you to defend was the failure to get medical assistance when this person was lying unconscious for three days in a cell and he was being checked upon. So I wonder if you could maybe in your last three minutes or part of it, talk about Mr. Denny and why Mr. Denny, who visited him, I don't remember his rank, but he was one of the defendants who passed by and checked on him, if I'm correct. During the daylight, not at night when people would be expected to be sleeping, but for eight hour periods during the day, he was repeatedly checked upon by Mr. Denny. Presumably he was out cold the whole time after having been beaten. Why isn't that enough to at least cause at least some juror to think that he actually saw this person had been injured and disregarded it? Thank you, Judge. First of all, you're correct. It's Jacob Denny. He's a deputy. He worked two shifts during this timeframe between the assault and the report of the medical issue. It bears emphasis that it's what Mr. Young said. Mr. Young never said that he was unconscious the whole time. He said that he was unconscious at one point, but he clearly was able to get up to use the restroom when he needed to. He ate his meals and he stayed in his bunk. So in those particular situations, Deputy Denny said that he usually tries to speak to the inmate. He didn't say that he specifically did in this case. He gave his general practice was his testimony. Mr. Young in turn said in his deposition testimony during that period of time between the assault and getting medical attention, I never spoke to any deputy. I didn't try to. I stayed in my bunk. That was his testimony. So I think that undermines this claim that Sergeant or Deputy Denny should have somehow been on notice that he faced a serious risk of he had a serious injury that needed medical treatment. Well, but there's a problem. Excuse me. I know it's hard with our being far away to know when one is talking, but with respect to Denny, Denny had a number of times where he did counts, inmate counts, scans, meal passes, etc. during those three days. And, and Mr. Young had a black eye and was essentially staying in his bed, except to go to the bathroom. And why isn't that on notice, putting Denny on notice that there's something wrong or else Denny was really not getting in the vicinity of Young in order to see the black eye. So if you could respond to that concern. Sure, certainly Judge Moore. He was in his bunk. He had a black eye. But the case law says that just having a black eye does not put a deputy on notice that someone has a serious injury that requires immediate medical attention. And that's, there's cases we cited in our brief and that Judge Burlesman cited in his opinion that say that that alone does not put someone on notice that that inmate needs medical attention and needs to be taken to the medical department. Also, it's important to emphasize that Young's own testimony was that he didn't get out of his bunk. Now that's not uncommon in a jail. Inmates stay in their bunk. They stay in their place. That's not uncommon. Inmates sleep. They're not, it's not like they have a regular routine of getting up and walking around or things of that nature. So excuse me for a second. Let me ask a question at this point on that. Is it a usual practice for them to have their blankets covering them during the daytime when apparently the rules are that they're not to do that? I, Judge, I'm not sure what the evidence reflects with regard to the blanket. I just know that, and whether that's a standard practice or something that would put a deputy on notice that there's a problem. I just know that I don't think that that's sufficient to establish that that particular deputy is aware of serious injury that requires medical attention. And it's certainly not sufficient to say that that particular deputy was deliberately indifferent. A black guy in and of itself does not indicate that someone needs immediate medical attention. And the fact that Mr. Young did not get out of his bunk would not allow deputies to see him limp, which was his other overt symptom. So if they didn't see that. You mentioned having a case that says that a black guy is not a serious medical condition. Is there something that you would point us to to substantiate that? Cain versus Ervin is cited. Cain versus Ervin is cited either in our brief or it's in Judge Bertelsman's opinion. Also, a case that actually What court is that? Cain versus Ervin? Cain versus Ervin. I have to pull it one second. It's cited in, it's a Sixth Circuit case. Sixth Circuit. OK, that's fine. No problem. And also Gonzalez versus Lasardi, which is a district court, Eastern District, Eastern District of Kentucky court case that actually was my case that I defended. I see that my time is up. Can I ask one question in connection with that, Judge Moore? Yes. What if the argument is not so much that the black guy was enough to insist on medical attention, but the black guy would suggest that he probably said, where'd you get that black guy and could have figured out from those responses that there were worse things involved? Could a jury have made that kind of assumption? Because it does seem pretty bad that somebody beat up and crossed by, even though they don't necessarily have to call the doctor. They may want to find out how the person got a black eye. That's why I'm asking. And they could. I mean, I think you could ask that question, Judge Rogers. But the question is, to me at most, that would be negligence, not deliberate indifference to a serious medical need. And you're checking numerous inmates during the course of a day. Being a deputy jailer is a difficult job. And you're checking them and you're trying to make sure that they're there, that they're work. And you're trying to maintain control and security within that facility. So it's easy, I think, to second guess what they do. But I think that's why the Supreme Court said we have to give deference to these jailers in terms of how they maintain security and safety within their facility. Aren't they also trying to make sure that the inmates are not beating each other up? And wouldn't a black eye suggest that? Yes, they should make sure that they don't get beat up. And in this case, Judge Moore, it's important to recognize there's no evidence of any pattern of practice of any inmate assaults at the Campbell County Detention Center. This evidence shows one assault. There's no pattern of practice. There's no history of inmate on inmate assaults here that would cause anyone to think there's a problem. Any further questions from any of the judges? No. No. Okay, well, we thank you very much for your argument. Rebuttal time, Mr. O'Hara. Your mic is not on. I'm sorry, Your Honors. No problem. Addressing the medical issue, the medical indifference issue, we agree that Denny had the most exposure to Mr. Young during the three-day period that he was allowed to language with his injuries. To address Judge Rogers' point that he made earlier, Judge Batchelder, the video was reviewed by Michelle when she did her investigation, I think a day or two after his injuries were discovered. And she described his injuries as including a bloody face and limping. Two things were important, especially regarding Denny. When you do meals, you're supposed to have the inmate come to the door, the meals are passed through a chute, and the inmate's arm band is checked. They're not allowed to give trays. Under the policy, they're not allowed to give meal trays to other inmates to deliver to an inmate. If an inmate doesn't respond or come to the gate to get his meal, that should be noted in the incident reports and it was not noted. So you take the meals and as Judge Moore, as you indicated earlier, the head counts also under their policy requires officers individually to go into cells to check armbands and scan them for a period of time during this time period that Young was in the jail. They actually use scanners that the officers use to scan the armbands. It's impossible to think that Denny and some of the other officers who did the head counts that are set out in our brief would not have noticed his injuries if they had complied with a policy regarding head counts. So I think there is substantial evidence that Judge Bertelsmann overlooked that would support, easily support an amendment deliberate indifference claim as to the medical care. For the three days, he was essentially ignored and had to suffer with a broken knee and the contusions to his head. Does the evidence show that the scanning of the wristband requirement was in existence at the time of these critical three days? The evidence is pretty equivocal about that. Apparently the scanner that they used was operating off and on, but they would still have to perform that physical function, Judge Moore. They would have to go in and check the armband whether they scanned it or not when they did the head counts. Otherwise, there's no way of telling whether the person assigned to a cell is actually in that cell. So I don't think there's any question that they in fact would know by complying with the jail's own policy regarding head counts and meals. Michelle, just very briefly, Michelle, on the first incident that she notes in her incident report, I think it's April 13 or 14, made a decision to move Ka out of a dormitory for 30 days. It's in her incident report. If she had that authority then, she certainly could have done it at the time she recommended reclassification of Ka. Thank you. Your time is up. We appreciate the argument from both sides and the case will be submitted.